**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEYS FOR APPELLANT:

**M. PATRICIA HACKETT**
**PETER A. TIMLER**
**SCOTT A. LOITZ**
Hackett & Associates, P.C.
South Bend, Indiana

ATTORNEY FOR APPELLEE:

**ROBERT J. PALMER**
May, Oberfell, Lorber
Mishawaka, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE THE GUARDIANSHIP OF ANTHONY J. PANZICA, Protected Person, | ) ) ) | |
| ANTHONY J. PANZICA, | ) ) | |
| Appellant-Former Protected Person, | ) ) | |
| vs. | ) ) | No.  71A04-1309-GU-448 |
| REAL SERVICES, INC., | ) ) | |
| Appellee-Former Temporary Guardian. | ) | |

APPEAL FROM THE St. JOSEPH PROBATE COURT
The Honorable J. Eric Smithburn, Special Judge
Cause No. 71J01-1209-GU-169

**March 19, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

The primary issues that we are called upon to decide involve the probate court's approval of the final accounting that concerned various disbursements by appellant-former protected person Anthony Panzica's temporary guardian to his wife for medical supplies and other expenses and whether the temporary guardian breached his fiduciary duties to Anthony. Anthony further contends that he was denied his due process rights when the probate court appointed a temporary guardian for him without adequate notice and claims that the probate court unreasonably delayed in providing him with a hearing that he had requested. Finally, Anthony argues that the probate court allegedly prevented him from presenting evidence at the hearing on the final accounting.

In light of the emergency circumstances and factors that existed in this case, we conclude Anthony's due process rights were not violated. We also find that the probate court committed no other error. Thus, we affirm the probate court's judgment.

FACTS

On September 28, 2012, REAL SERVICES, Inc. (REAL SERVICES), filed an emergency petition seeking the temporary guardianship over Anthony. On that same day, the probate court issued an ex parte order granting REAL SERVICES'S request. Anthony's son and estranged business partner, William, had submitted an affidavit in support of the emergency petition.

The affidavit stated that on August 6, 2005, Anthony was examined by Douglas Streich, Ph.D. At that time, Dr. Streich determined that Anthony was suffering from

2

dementia. The discharge summary noted that Anthony was an eighty-one-year-old male with no history of prior psychiatric problems but was very disorganized and confused. The report also noted that Anthony was getting very "paranoid and delusional" about the motives of his wife and children with regard to his money. Appellant's App. p. 28.

Anthony reported that he had undergone some neuropsychological testing about two years earlier, but there was no diagnosis of dementia. After performing a CT scan, Dr. Streich observed that Anthony had suffered brain loss that would eventually lead to memory difficulties. Dr. Streich's diagnostic impressions included "senile dementia . . . of the Alzheimer's type." However, it was also noted that Anthony "should be able to function fairly well in his daily routine with minimal assistance." Appellant's App. p. 30.

The affidavit indicated that on August 6, 2005, Anthony was also examined by Mallikarajun Patta, M.D. The comprehensive psychiatric evaluation and initial treatment plan were attached to the affidavit. The "chief complaint" provided by Anthony's wife was that he was getting depressed and confused and that "outpatient treatment was not appropriate." Id. Anthony was diagnosed as paranoid, and he claimed that his wife and children were trying to cheat him out of his money. As a result, Anthony was placed in Holy Cross Village, an assisted living facility in August 2008, because of his need for ongoing care.

The affidavit averred that just three weeks before the filing of the emergency petition, Anthony had given his "private Secretary," Kelly R. DeVreese, a twenty-nine year-old dining employee who had no financial expertise, the authority to act on his

3

behalf "regarding all financial matters." Appellant's App. p. 26. Anthony allegedly had written a check to DeVreese for $100 and had sent a letter to the Notre Dame Credit Union authorizing DeVreese to act on his behalf regarding his personal accounting matters. Anthony's message to the Credit Union included directions that their employees should call him if they wished to further verify his instructions. Anthony provided the Credit Union with his phone number. However, the signature on both the letter and the check appeared to differ from the other writing on those documents.

At some point, Anthony filed a petition for dissolution of marriage from his wife, Irene. Irene also lived at Holy Cross Village in a different room. William eventually learned that Anthony and DeVreese had stopped paying Irene's invoices to Holy Cross Village and had "frozen her out of" Anthony's accounts. Id. at 27. Hence, William alleged that Anthony's accounts could be at risk, jeopardizing his and Irene's health care and well-being unless a temporary guardian was appointed.

Finally, the affidavit stated that William would have his father evaluated and he would file an updated medical report with the probate court during the duration of the temporary guardianship. When REAL SERVICES was appointed as temporary guardian, the probate court determined, in part, that "immediate and irreparable injury . . . may occur to the alleged incapacitated person before [he] can be heard in response to the petition." Id. at 34.

On October 8, 2012, REAL SERVICES filed a petition requesting a court order for Anthony to submit to a follow-up examination by Dr. Macellari. The petition stated

4

that Dr. Macellari examined Anthony in 2002, 2005, and 2008 and that the 2002 and 2005 visits showed advancing dementia. REAL SERVICES indicated that it was in the process of obtaining the records from Anthony's 2008 examination.

A letter from Anthony's primary care physician was also attached to the petition. The letter from Dr. Andrew McAfee, dated October 3, 2012, indicated that he did not have access to any information about Anthony's finances and "did not feel . . . able to make [an] adequate decision about his competency in this matter." Appellant's App. p. 4. As a result, REAL SERVICES requested an order from the probate court requiring Anthony to submit to an examination by Dr. Macellari within forty-five days. The trial court granted REAL SERVICES'S motion.

On October 24, 2012 Anthony, through DeVreese, filed an unsigned letter with the probate court requesting a hearing. Attached to Anthony's letter was a letter from James F. Brogle, Ph.D., a licensed psychologist. The letter, dated September 20, 2012, eight days before the emergency petition for appointment of a temporary guardian was filed, and over a month before Anthony's letter requesting the hearing, offered an opinion that there were no grounds for a guardianship. On that same day, Anthony filed a petition for a termination of the temporary guardianship or that the probate court's order be modified. Anthony's written objection to the temporary guardianship, included the following:

> (i) Mr. Panzica, in relevant part, specifically requested that his scheduled evaluation with Dr. Macellari be delayed until after Hearing. In support, Mr. Panzica clearly and unequivocally informed the Court that he had not seen Dr. Macellari since 2008, and did not trust his judgment.

5

(ii) Mr. Panzica also included in his pleading a letter from his current treating psychologist, Dr. James E. Brogle, dated September 20, 2012, which provided "[Dr. Brogle's] professional opinion that there are no grounds for Mr. Panzica to be placed in guardianship or otherwise legally restricted from independent self control." In fact, Dr. Brogle's letter describes Mr. Panzica as "an 88 year old senior citizen with exceptional mental acuity for his age."

(iii) Mr. Panzica also included in his petition to the Court, a statement of his distress that his bank accounts were frozen and he had yet to receive documentation informing him of these actions. Further, $50,000 had been withdrawn from his bank account without his knowledge or approval, most of which was used to pay living expenses for his wife from whom he had been separated since approximately 2007. Mr. Panzica, on the other hand, had never been delinquent in the payment of his expenses.

(iv) Mr. Panzica ended his petition, correctly, by (a) requesting the Court to "consider all of these facts and lift the guardianship over me" (i.e., he requested that the temporary guardianship be terminated) (emphasis added); (b) noting that "I have yet to see any evidence that points in the direction of me not being able to make decisions pertaining to my financial affairs. I have been successful in life in all of my endeavors;" and (c) after thanking the Court for considering this pleading, requesting that the Court "[p]lease schedule this for a hearing as soon as possible and relay to me the date and time of the hearing."

Appellant's App. p. 40-42.

In response to Anthony's contentions, the probate court set the petition for a status hearing on November 8, 2012. However, on October 31, 2012, the Court entered another ex parte order, this time directing that a Guardian ad Litem (GAL) be appointed for Anthony. Anthony indicated that he was represented by counsel, but at the status conference, Anthony was not permitted to speak and the petition requested that attorney William Wilson be appointed as the GAL. At the hearing, it was found that Anthony was not adequately represented in the guardianship proceeding, so attorney Wilson was

6

appointed to represent Anthony's interests. The trial court continued the hearing and REAL SERVICES filed a petition to continue the temporary guardianship.

The petition stated that Anthony had been ordered to submit to an examination by Dr. Macellari and noted that Wilson was appointed as Anthony's GAL. REAL SERVICES'S temporary guardianship was due to expire on November 28, 2012, two days before Anthony was scheduled for an examination by Dr. Macellari. The probate court granted a ninety-day extension of the guardianship to permit Dr. Macellari's examination, and for sufficient time to allow for the submission of his report and any further testing that might be allowed.

On November 27, 2012, REAL SERVICES filed its petition for guardian fees and the probate court entered an ex parte order approving the fees on the same day. On December 6, 2012, attorney Mary Joe Anderson appeared on Anthony's behalf. Approximately twelve days later, Anderson filed a petition to terminate the guardianship in part because "the protected person is no longer an incapacitated person." Appellant's App. p. 53. Anderson also demanded a jury trial if the petition to terminate the guardianship was denied.

A subpoena was issued for William to appear at the hearing on January 3, 2013. After receiving notice of the hearing on December 26, 2012, William appeared by attorney James Masters. Because William was already scheduled to be in Florida, he filed a motion to continue the hearing. The motion was granted, and on January 16, 2013, Anthony's counsel petitioned for an immediate preliminary injunction seeking an

order restraining REAL SERVICES from using substantial amounts of Anthony's funds, which amounted to over $45,000, to pay Irene's delinquent rent and related expenses without Anthony's knowledge or approval.

On January 18, 2013, Erin Newsom, the guardian partner coordinator at REAL SERVICES filed a verified report of temporary guardian. The report stated that Anthony was referred to REAL SERVICES by attorney Marcel Lebbin, who was contacted by Adult Protective Services in addition to Anthony's family members. The parties believed that because of cognitive impairments reported by Anthony's physicians over the years, Anthony was mismanaging his financial affairs. Staff members at Holy Cross Village also were concerned that Anthony was not properly managing his medical care.

Newsom submitted a several page summary of the events after the guardianship had commenced, primarily regarding DeVreese's handling of Anthony's finances and the amount of money that he provides her. Newsom also commented that Anthony refused to attend numerous medical appointments, constantly changed medical providers, and yelled at the staff at Holy Cross.

Newsom concluded that

Considering my interactions with Mr. Panzica over the last four months, I would strongly recommend that he receive further medical evaluations to ensure that he is receiving all the support, both medically and financially, that he requires.

Appellant's App. p. 12-16.

The hearing on the motion to terminate the guardianship was subsequently rescheduled for February 21, 2013, which resulted in an order for Anthony to submit to a

8

neuropsychological evaluation. The probate court also ordered a ninety-day continuance on the petition to terminate the guardianship. Prior to that hearing, the original judge recused himself. Another judge entered a preliminary injunction ordering that REAL SERVICES was to be enjoined from appropriating Anthony's assets for the purpose of paying any indebtedness incurred by, for, or on behalf of Irene, and that the preliminary injunction would extend through February 21, 2013.

Irene had filed a petition to dissolve the marriage on February 15, 2013. In an emergency request for provisional relief, the dissolution court ordered Anthony to pay Irene's medical expenses at Holy Cross Village. More particularly, the order stated in part that

3.) The Court finds that an emergency exists warranting an immediate ruling on wife's emergency application.

4.) The Court finds that husband shall be required to pay all of wife's expenses associated with her residence at Holy Cross Village. The Court declines to apportion the funds in the deposit accounts currently held in husband's name between the parties.

5.) Wife represented that the parties receive income as a result of their one-quarter interest in the Panzica real estate holdings. The Court finds that said income distribution shall hereby be divided equally between the parties, and that the parties shall maintain separate accounts in which the income distributions shall be deposited.

Supp. App. p. 64-65.

When there was a distribution from one of Irene and Anthony's businesses, instead of Anthony receiving over $1.2 million, the dissolution court required one-half of that amount to be held in an account for Irene, pending the finalization of the dissolution.

9

The probate court then agreed to hear evidence on the petition to terminate the guardianship. The court also noted that it may find it necessary to alter or amend the preliminary injunction during the period prior to February 21, 2013, based upon an emergency or extraordinary circumstances.

The GAL also filed a report, which identified some of the same events that were contained in REAL SERVICES'S report. Although the GAL did not take a position as to whether Anthony was incapacitated, he did report some "disconcerting" behaviors. For instance, the GAL stated that

> [Anthony] would be well served by completing the neuropsychological testing. If he has issues, then he would perhaps deal with them through coping mechanisms, therapy, or in some other way. . . . Without testing . . . it is possible that [Anthony's] mental infirmities (if he has any) will continue to worsen with resulting harm that might have been avoided.

On May 9, 2013, Anthony filed a verified supplemental motion to vacate temporary guardianship orders, a motion to vacate an order requiring further psychological evaluation, a motion to strike the existing report of Dr. Eaton, and an objection to a permanent guardianship.

Before the hearing on the motion to terminate the guardianship, REAL SERVICES filed a report from Bradford J. Eaton, Ph.D.[1] Dr. Eaton was not able to complete the neuropsychological testing because Anthony became fatigued after almost ninety minutes. Although Dr. Eaton suggested that Anthony return and take the test, he canceled each time. At some point following consultation with the parties and counsel,

---

[1] As discussed below, the probate court subsequently struck Dr. Eaton's report in its order terminating the guardianship.

10

the probate court ordered Anthony to complete the testing with Dr. Eaton. The parties were also ordered to participate in mediation, and REAL SERVICES was required to hire counsel for Anthony of his choosing in the dissolution action that Irene had filed.

After several continuances, REAL SERVICES filed an emergency petition for possession of Anthony's vehicle. The petition was based on the fact that on May 1, 2013, Anthony drove his vehicle at a time that his operator's license was expired. However, that issue became moot when the probate court terminated the temporary guardianship.

The hearing on the petition to terminate the guardianship that was conducted on May 13, 2013, consisted of a consultation between the attorneys and the probate court in chambers about how to settle the issues. The probate court entered an order that same day, granting Anthony's supplemental motions to vacate orders of temporary guardianship, vacating the order requiring further psychological evaluations, and striking the existing report of Dr. Eaton. However, Anthony's requests for the immediate return of funds and that REAL SERVICES post a bond were denied. The hearing on the final account was scheduled for June 10, 2013.

REAL SERVICES filed its petition on the final account and amended guardian's petition for attorney and guardian fees on May 20, 2013. Anthony objected to REAL SERVICES'S final accounting and a demand for reimbursement and surcharge on May 29, 2013. Anthony filed objections to the final accounting and demanded a reimbursement and surcharge on the grounds that REAL SERVICES had breached its

fiduciary duties by distributing guardianship assets for Irene's benefit and by violating his due process rights.

REAL SERVICES filed a response to the objection and an amended final accounting. The probate court conducted a hearing on the final accounting and the remaining matters on June 10, 2013, but Anthony chose not to call any witnesses. The probate court took the matter under advisement and denied Anthony's objection to REAL SERVICES'S amended final accounting and demand for reimbursement and surcharge and approved the amended final accounting. More particularly, the trial court's order provided in relevant part that

> 3. Housing and medical expenses are necessaries and marital assets may be used to pay necessaries of a spouse. . . .
>
> 4. The issue of whether the assets of the Guardianship Estate of [Anthony] are marital or individual assets is not within the jurisdiction of this court, but the [temporary guardian] did not act in bad faith or fraudulently or with gross misconduct in determining under the circumstances, that assets in the name of [Anthony] could be used to pay necessary housing and medical expenses of [Irene], the lawful wife of [Anthony].
>
> . . .
>
> 6. Until it was terminated by this Court, the Temporary Guardianship was established by a valid Court Order on which [temporary guardian] reasonably relied, and [temporary guardian's] undertakings on behalf of [Anthony] were done pursuant to and not in derogation of said Order.
>
> 7. That the St. Joseph Circuit Court entered an Order on 2-19-2013, which provided that "Husband shall be required to pay all of Wife's expenses associated with her residence at Holy Cross Village . . ." is further indication that the [temporary guardian's] prior payment of [Irene's] housing and medical care costs was not done in bad faith, fraudulently or with gross misconduct.

12

8. [Temporary guardian] is not liable to [Anthony] for expenses paid for housing and medical care of [Irene]. . . .

9. [Temporary guardian] is entitled to recover costs and fees for its services.

10. [Anthony] has not objected to [temporary guardian's] attorney fees on grounds that they are unreasonable or excessive.

. . .

12. [Anthony's] Objections to [temporary guardian's] Final Accounting and Amended and Final Accounting and Demand For Reimbursement and Surcharge are DENIED.

. . .

17. The Proposed Final Distributions are APPROVED pursuant to T.G.'s Amended and Final Accounting.

Anthony now appeals.

## DISCUSSION AND DECISION

### I. Standard of Review

In guardianship proceedings, the probate court's findings and orders are within the probate court's discretion. E.N. v. Rising Sun-Ohio Cnty. Cmty. Sch. Corp., 720 N.E.2d 447, 450 (Ind. Ct. App. 1999) (citing Ind. Code § 29-3-2-4). Thus, this Court should apply an abuse of discretion standard in reviewing the probate court's findings and order. In re Guardianship of A.L.C., 902 N.E.2d 343, 352 (Ind. Ct. App. 2009). "An abuse of discretion occurs when the probate court's decision is clearly against the logic and effect of the facts and circumstances presented, or if the court has misinterpreted the law." Id. In applying the abuse of discretion standard, however, this Court should review questions

of law de novo and we "owe no deference to the legal conclusions of the probate court." In re Guardianship of Hollenga, 852 N.E.2d 933, 937 (Ind. Ct. App. 2006).

Because the probate court made special findings and conclusions sua sponte in its Order on Final Accounting, we will examine those findings and determine whether the probate court abused its discretion. In re Guardianship of A.L.C., 902 N.E.2d at 352. We apply a two-tiered standard of review to the findings and conclusions that considers (1) whether the evidence supports the specific findings made by the probate court and (2) whether the findings support the judgment. McGinley-Ellis v. Ellis, 638 N.E.2d 1249, 1252 (Ind. 1994). We will set aside any of the probate court's findings that are clearly erroneous. In re Guardianship of A.L.C., 902 N.E.2d at 352. "Findings of fact are clearly erroneous when the record lacks any facts or reasonable inferences to support them." Id. Similarly, under the two-tiered standard of review, this Court should set aside the probate court's judgment if it finds it to be clearly erroneous. Id. "A judgment is clearly erroneous when unsupported by the findings of fact and conclusions thereon." Id.

## II. Anthony's Claims

### A. Probate Court's Findings

Anthony first claims that the final accounting must be set aside because the probate court's findings are not supported by the evidence. Anthony argues that REAL SERVICES presented no testimony in support of the final accounting.

Notwithstanding this contention, REAL SERVICES filed a guardian's petition with regard to the final accounting along with an amended guardian's petition for

14

attorney and guardian fees on May 20, 2013. In responding to Anthony's objections at the hearing on the final accounting, REAL SERVICES'S counsel stated that everything it had done could be verified, but he could not verify Anthony's actions such as opening new credit cards or writing checks. Moreover, it has been held that a verified complaint is sufficient evidence to meet the preponderance of the evidence standard of proof. Eads v. Hill, 563 N.E.2d 625, 632 (Ind. Ct. App. 1990).

Here, the record demonstrates that the verified final accounting was unrefuted by the evidence. Anthony's affidavit that he had filed with the probate court did not refute anything contained in the verified accounting. Moreover, the order approving the accounting was premised on the prior orders of the court with which REAL SERVICES complied. Indeed, the probate court can take judicial notice of prior pleadings and orders in the case. Schwedland v. Bachman, 512 N.E.2d 445, 451 (Ind. Ct. App. 1987).

Additionally, although Anthony's written objection to REAL SERVICES'S final accounting contained an objection that the guardian and attorney fees were neither reasonable nor for Anthony's benefit, that objection did not refer to any item of the fees that were claimed to be excessive. Also, Anthony did not question the hourly rates or the amount of time that he spent on the case. And Anthony made no specific objection to the amount of any disbursements that REAL SERVICES had made.

There is also support for the probate court's findings that REAL SERVICES is entitled to recover costs and fees for its services and that Anthony did not object to the attorney fees on the grounds that they were unreasonable or excessive. In fact, Indiana

15

Code section 29-3-9-9 requires a guardian to pay all expenses of the proceeding, including medical, professional, and attorney fees, out of the property of the protected person; see also In re M.K., 844 N.E.2d 555, 558 (Ind. Ct. App. 2006). Finally, we note that a trial judge possesses personal expertise that may be used when determining reasonable attorney fees. See Hickman v. Irwin Union Bank, 811 N.E.2d 843, 851 (Ind. Ct. App. 2004).

### B. Breach of Fiduciary Duty—Disbursements

Anthony argues that REAL SERVICES breached its fiduciary duty to him in several ways. For instance, Anthony challenges certain disbursements to Irene while she was living at Holy Cross Village and that a GAL was appointed without notice.

Instructive here is In re Hall, where the co-guardians and children of Hall, who objected to the trial court's decision to distribute some of the guardianship's assets and a monthly stipend to Helen, Hall's wife of three years. Hall was an eighty-one year-old nursing home patient. On appeal, a panel of this Court determined that the assets were part of the marital pot, and no court order was needed for either the husband or wife to dispose of the assets. 694 N.E.2d 1168, 1169 (Ind. Ct. App. 1998). However, it was assumed that the assets awarded to Helen were not assets of the marriage. Rather, John's individual assets were held outside of the marital estate. Indeed, this Court framed the issue as "whether the trial court had the authority to distribute guardianship assets to the wife of an incapacitated ward." Id. at 1170.

In determining that the trial court did in fact have the authority to distribute the assets to the wife, the doctrine of necessaries was also discussed. It noted that Helen was dependent on her "financially superior spouse" and that Helen's separate funds were not sufficient to meet her expenses. Id. at 1170.

Similarly, the evidence demonstrated in this case that Anthony and Irene have been married for nearly sixty years. After William learned that Anthony and DeVreese ceased paying his mother's invoices to Holy Cross Village and had frozen her out of his accounts, William alleged in his affidavit that such actions "could result in my mother's health care being compromised." Appellant's App. p. 27. Thus, given the urgency and emergency of the situation, REAL SERVICES paid for Irene's expenses at Holy Cross Village and included the disbursements in the final accounting. If the assets were marital assets, there was no need for a court order because the assets belonged to Irene anyway. The fact that the affidavit stated that Anthony had frozen Irene out of his accounts did not change the nature of the assets as marital property. On the other hand, if the assets belonged to the guardianship and were owned solely by Anthony, the probate court nonetheless had the authority to approve the disbursements in the final accounting in accordance with Hall.

In any event, after the disbursements were made to Irene, Anthony, through his counsel, obtained an injunction from the court prohibiting REAL SERVICES from making any additional payments to Irene from Anthony's accounts. There is no allegation that REAL SERVICES did not comply with the injunction.

17

We also note that while REAL SERVICES asserts that it did not err in paying for Irene's expenses based upon the facts and circumstances before it and the emergency situation involving Irene's health care based upon In re Hall, any error that REAL SERVICES might have committed is now moot. Indeed, the issues that are now before us involve the probate court's approval of REAL SERVICES'S final accounting and not the actions at the time of the disbursement. The order states that

1. Housing and medical expenses are necessaries and marital assets may be used to pay necessaries of a spouse.

2. The issue of whether the assets of the guardianship estate of [Anthony] are marital or individual assets is not within the jurisdiction of this Court, but the [temporary guardian] did not act in bad faith or fraudulently or with gross misconduct in determining, under the circumstances, that assets in the name of [Anthony] could be used to pay necessary housing and medical expenses of [Irene], the lawful wife of [Anthony].

. . .

7. That the St. Joseph Circuit Court entered an order on 2-19-2013, which provided that 'husband shall be required to pay all of wife's expenses associated with her residence at Holy Cross Village . . . is further indication that the [temporary guardian's] prior payment of [Irene's] housing and medical care costs were not done in bad faith, fraudulently or with gross misconduct.

Id. at 22-23.

In light of the above, it is apparent that any claim that Anthony has as to whether the property should be classified as individual assets or marital assets should be resolved in the dissolution court. In fact, Anthony concedes as much in his brief by stating that his responsibility for Irene's expenses at Holy Cross Village, along with the disposition of the marital estate, "needs to be resolved in the divorce proceedings which now pends." Appellant's Br. p. 15. As a result, Anthony's contention that REAL SERVICES

18

breached its fiduciary duty in distributing assets before the dissolution petition was filed fails. Thus, we decline to set aside the distributions that the probate court ordered REAL SERVICES to pay to Irene.

### III. Due Process

### A. Guardianship Without Notice

Anthony argues that appointing REAL SERVICES and establishing a temporary guardianship without providing him with proper notice violated his right to due process without a hearing. Notwithstanding this contention, Indiana Code section 29-3-3-4(a) provides in part that "no such appointment shall be made except after notice and hearing unless it is alleged and found by the court that immediate and irreparable injury to the person or injury, loss, or damage to the property of the alleged incapacitated person or minor may result before the alleged incapacitated person or minor can be heard in response to the petition." (Emphasis added).

William's emergency petition for the appointment of a temporary guardian for Anthony states in part that "an emergency exists and immediate and irreparable injury to the person or injury, loss, or damage to the property of the incapacitated person may result before the incapacitated person can be heard in response to the petition." Appellant's App. p. 24. It further alleged that William believed that "irreparable harm, loss or damage will result to my father . . . if an immediate temporary guardianship cannot be established for him and in support states the following. . . ." Id. at 26.

19

William identifies the medical records establishing a history of dementia, Anthony's placement in Holy Cross Village because of his need for ongoing continuing care, the authority given to DeVreese regarding access to all of Anthony's bank accounts, and the fact that Irene's health care could be compromised because Anthony and DeVreese had stopped paying Irene's invoices from Holy Cross and had frozen Irene out of Anthony's accounts. Appellant's App. p. 26-27.

In light of these averments, the probate court's order specifically "finds that immediate and irreparable injury may occur to the alleged incapacitated person or injury, loss or damage to the property of the alleged incapacitated person may result before the alleged incapacitated person can be heard in response to the petition." Id. at 34. Therefore, we conclude that the petition and the probate court's order complied with the requirements of Indiana Code section 29-3-3-4 for establishing a temporary guardianship without notice.

To the extent that Anthony is challenging this statute as unconstitutional, and in violation of his due process rights because it authorizes a temporary guardianship without notice, his argument also fails. In In re Adoption of M.J.C., we construed both Indiana Code section 29-3-3-4(a) and Indiana Code section 29-3-3-4(b), and observed that

> Reading these two subsections together and contrasting them with the general provisions for the appointment (IC 29-3-6-1) and for the removal (IC 29-3-12-4) of guardians, it seems quite clear that the legislature intended to provide for the emergency appointment of temporary guardians, including the appointment of a temporary guardian when a duly appointed guardian was not effectively performing, without the necessity of notice and hearing. Provision is made for after-the-fact hearing upon request at the earliest possible time. Considering the necessary finding

20

of emergency as a prerequisite to such an appointment, the statute provides all the process that is due.

590 N.E.2d 1095, 1099 (Ind. Ct. App. 1992) (emphasis added).

In light of In re Adoption of M.J.C., we conclude that Anthony was not deprived of due process by the probate court appointing a temporary guardian without notice.

### B.  Delay in Requested Hearing

Anthony also contends that the probate court's delay in holding the hearing to terminate the temporary guardianship violated his due process rights.  Anthony predicates this claim on his pro se request to terminate the guardianship "when he requested it." Appellant's Br. p. 31.  Thus, Anthony argues that his due process rights were violated "by keeping him under a temporary guardianship for nearly eight months and forcing him to undergo an unwanted psychological evaluation."  Id.

Notwithstanding these contentions, Anthony seemingly ignores the fact that the probate court appointed a GAL to represent him.  Moreover, Anthony did not object to the various extensions of time and continuances of the hearings.  In other words, Anthony did not insist that the hearing take place immediately, even though several of the court's orders declared that loss or damage to the property of Anthony might result before he could be heard in response to the petition.  Also, the fact that Anthony was represented by a GAL at the hearing in response to his pro se request for a hearing alters his due process claim.  Indeed, the GAL was appointed because Anthony was not adequately represented.

21

In our view, the case of In re Atkins, 868 N.E.2d 878 (Ind. Ct. App. 2007), is instructive here. In Atkins, an Indiana statute and a Hamilton County local probate rule required the incapacitated person's presence at the hearing in all guardianship matters that sought to declare an adult incapacitated for any reason. Because none of the exceptions to the statute or local rule applied, Atkins required the incapacitated person to be present. However, in determining that no reversible error occurred when the trial court did not require the incapacitated person to be present, we observed that

> the right to be present at the guardianship hearing is akin to a due process right belonging to the allegedly incapacitated person. Here, therefore, it was Patrick's right to be present at the hearing; neither Brett nor the Atkinses have standing to enforce that right. It was the duty of Patrick's court-appointed GAL to represent Patrick's interest and insist that he be present at the hearing. The GAL did not do so. Consequently, this right has been waived and we decline to remand for a new trial on this basis.

Id. at 887.

Like the circumstances in Atkins, the GAL who was appointed to represent Anthony's interests did not insist that a hearing on the termination of the temporary guardianship take place immediately, nor did he object to continuing the hearing pending receipt of a physician's report. As a result, because the GAL consented to various continuances and extensions of time of the hearing and even consented to have the testing performed by a particular physician, Anthony cannot claim that his due process rights were violated on this basis.

22

Similarly, Anthony contends that the probate court coerced him in ordering him to have a neuropsychological evaluation performed to determine whether he was incapacitated. Notwithstanding this contention, Indiana Trial Rule 35(A) provides that

> When the mental or physical condition (including the blood group) of a party, or of a person in the custody or under the legal control of a party, is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination.

In this case, William's emergency petition for appointment of a temporary guardian placed Anthony's mental condition in issue. Similarly, Anthony's pro se letter and various attachments to his affidavit placed his capacity at issue. In light of these circumstances, REAL SERVICES was well within its rights to request psychological testing.

Finally, to the extent that Anthony argues that the probate court did not have the power to order the neuropsychological testing as a violation of due process, that claim is also moot, as Anthony was not free to disregard those orders. See In re Pope, 772 N.E.2d 405, 406 (Ind. 2002) (holding that the willful and intentional disobedience of the orders of a court can constitute indirect criminal contempt). In fact, even if the order is erroneous, it still must be obeyed until it is reversed on appeal. A party's remedy regarding an erroneous order is an appeal, and disobedience of the order is contempt. City of Gary v. Major, 822 N.E.2d 165, 169-70 (Ind. 2005).

C. Denial of Opportunity to Present Evidence

23

Finally, Anthony argues that he was deprived of the opportunity to present evidence at the hearing on the final accounting. Thus, Anthony argues that this denial violated his fundamental right to due process and the probate court should set the final accounting aside.

Notwithstanding this contention, Anthony never attempted to present evidence at the hearing. At no time during the hearing did Anthony seek to call any witnesses to testify. Rather, Anthony's counsel concluded her argument without requesting permission to call any witnesses, and stated

> We're simply saying you know what? In this case, [REAL SERVICES] you breached your duty, you pay your own attorneys, you pay for the guardian ad litem who you selected and asked to be here. And by the way, you pay for this injury to Mr. Panzica to the tune of his attorney's fees. That's what we're asking for Your Honor, and we ask for that ruling, and then with that, with the fees being paid by Real Services and Mr. Panzica not being further damaged, with that the accounting can be approved and we can conclude and we can go on and work in the divorce.

Anthony was afforded an additional opportunity to call witnesses in replying to REAL SERVICES'S response to his objections, but he did not do so. Rather than requesting witnesses to testify, Anthony again placed the burden on the probate court to make the determination of whether witnesses should testify. Specifically, it was stated that "[I]f the Court does not feel satisfied with argument, we anticipated proofs on the accounting, and I'm prepared to cross-examine Real Services on the matters, if the Court requires that, or feels that, that would be helpful." Tr. p. 26.

Later in the hearing, Anthony's counsel stated "I think there is sufficient evidence in the record, when you look at who did the affidavit, who the bills are even issued to."

24

<u>Id.</u> at 28. Finally, at the conclusion of the hearing, Anthony was again offered the opportunity to call witnesses if he deemed it necessary to do so. However, rather than calling an attorney as a witness, counsel only argued what the testimony would reveal. <u>Id.</u> at 30-31.

In sum, nothing in the record demonstrates that the probate court precluded Anthony from calling witnesses during the hearing. Moreover, it was not the probate court's place to respond to counsel's inquiries as to whether the court desired to hear testimony on the issues. In fact, this court has previously determined that an argument that a trial court failed to permit a party to present evidence is waived if the party does not attempt to offer evidence. <u>Taylor v. State</u>, 171 Ind.App. 476, 485, 358 N.E.2d 167, 173 (1976). In short, Anthony has failed to show that he was denied due process on this basis.

CONCLUSION

In light of our discussion above, we conclude that the order approving REAL SERVICES'S final accounting is supported by the evidence, and it was proper for the probate court to order REAL SERVICES to pay for Anthony's wife's expenses and necessaries, particularly in light of the dissolution court's order directing Anthony to pay her medical expenses. Because of the allegation that injury to Anthony or his property could result before a hearing could be conducted, REAL SERVICES was properly appointed as temporary guardian over Anthony without notice. Finally, Anthony has failed to show that his due process rights were violated because the hearing was not

25

immediate, and no objections to continuances or extensions were made, and the probate court did not prevent Anthony from presenting evidence at the hearing on the final accounting.

The judgment of the trial court is affirmed.

NAJAM, J., and CRONE, J., concur.